**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

_____
                                                )
KATHRYN CHAMPION, on behalf of herself    )
and all others similarly situated,                )          Case No. _____
                                                )
                        Plaintiff,                )
v.                                              )
                                                )          **CLASS ACTION**
1-800 CONTACTS, INC.,                         )          **DEMAND FOR JURY TRIAL**
                                                )
                        Defendant.              )
_____)

## COMPLAINT

Plaintiff Kathryn Champion, by and through undersigned counsel, brings this action individually and on behalf of a class of all persons and entities similarly situated, against 1-800 Contacts, Inc. ("1-800 Contacts") for damages and injunctive relief under the antitrust laws of the United States and the law of the state of Florida. Plaintiff alleges as follows based on personal knowledge, investigation of counsel and on information and belief:

### NATURE OF THE ACTION

1.      This action arises as a result of a series of bilateral agreements between 1-800 Contacts and numerous competitors in the market for online sales of contact lenses that prevent the parties to those agreements from competing against one another through online search advertisements. According to the Federal Trade Commission ("FTC"), 1-800 Contacts, which is the largest online seller of contact lenses in the United States, has been the "driving force" behind these Bidding Agreements and the anticompetitive scheme that they enable.

2.      As detailed in the FTC's Complaint, beginning in 2004, 1-800 Contacts

1

secured agreements with at least fourteen competing online sellers of contact lenses providing that the parties would not bid against one another in certain search advertising auctions conducted by internet search engines (the "Bidding Agreements"). 1-800 Contacts and each of the competitors knew that by entering into the Bidding Agreements, market share and profits would be protected.

3.      1-800 Contacts sent at least fourteen rival online sellers cease-and-desist letters whose paid internet advertisements appeared in searches for the term "1-800 contacts" or common variations of the term. 1-800 Contracts claimed that its trademark was infringed every time a rival's internet advertisement appeared in response to such a search.

4.      Faced with potentially costly trademark litigation unless they conceded to 1-800 Contacts' demands, the fourteen rival online sellers entered into the Bidding Agreements.

5.      These Bidding Agreements unreasonably restrain both price competition in search advertising auctions and the availability of truthful, non-misleading advertising. The Bidding Agreements constitute bid-rigging and market allocation agreements among horizontal competitors, which are unlawful *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), or alternatively, under the "quick look" test or Rule of Reason.

6.      In its answer filed in the FTC Action, 1-800 Contacts admitted that it entered into these Bidding Agreements with competitors in all but one case to allegedly resolve threatened or actual trademark litigation.

7.      Plaintiff brings this action asserting claims under Section 1 on her own behalf and on behalf of a Nationwide Class, as well as under the Florida Deceptive Trade Practices Act and Florida Antitrust Act of 1980 on behalf of a Subclass of Florida residents.  On behalf of herself and the Classes, Plaintiff seeks, as described more fully below, to recover damages, including

treble damages, costs of suit, and reasonable attorneys' fees arising from Defendant's illegal conduct, and injunctive relief.

## PARTIES

8.      Plaintiff Kathryn Champion is an individual residing at 3001 S. Ocean Drive, Apartment 1617, Hollywood, Florida 33019.  During the Class Period, Mrs. Champion purchased contact lenses directly from 1-800 Contacts via its website.

9.      Defendant 1-800 Contacts is a corporation organized under the laws of Delaware, with a principal place of business at 66 East Wadsworth Park Drive, Draper, Utah 84020.  1-800 Contacts sells contact lenses and related products over the internet and by telephone throughout the United States, including the State of Florida.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1337(a), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. § 1711, *et seq.*).  The claims in this case arise under federal antitrust laws and therefore present federal questions; the claims are between citizens of different states and the amount in controversy exceeds $75,000; and the aggregate amount of damages for the claims of the putative class exceeds $5 million and at least one of the members of the putative class is a citizen of a different state than 1-800 Contacts.

11.      Plaintiff's state law cause of action arises under the law of Florida and from the same transactions, occurrences and nucleus of operative fact that gave rise to the Plaintiff's cause of action under the federal antitrust laws, over which this Court has original and exclusive jurisdiction.  Accordingly, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1367.

12.      The Court has personal jurisdiction over 1-800 Contacts pursuant to 15 U.S.C.

§§ 15 and 22 because Defendant:  (a) transacted business throughout the United States, including in this District; (b) sold hundreds of millions of dollars in and provided services related to contact lenses throughout the United States, including this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

13.     Venue is proper in this judicial district pursuant to  28 U.S.C. § 1391 because: (a) 1-800 Contacts conducts substantial commerce in this District; (b) 1-800 Contacts has engaged in the challenged conduct and employed the challenged trade restraints in this District; (c) Plaintiff purchased contact lenses from the 1-800 Contacts during the Class Period while residing this District; and (d) Plaintiff suffered antitrust injury in this District because of 1-800 Contacts challenged conduct.

## CLASS ALLEGATIONS

14.     Plaintiff brings this action on behalf of herself and all other similarly situated members of the classes defined below pursuant to Fed. R. Civ. P. 23.

15.     Plaintiff brings claims under the Sherman Act on behalf of the following Class (the "National Class"):

> All persons and entities who made retail purchases of contact lenses from 1-800 Contacts in the United States, at any time between January 1, 2004, and the present (the "Class Period").

16.     Plaintiff also brings claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") and Florida Antitrust Act of 1980 on behalf of the following Subclass (the "Florida Class"):

4

All persons and entities residing in the State of Florida who made retail purchases of contact lenses from 1-800 Contacts, at any time between January 1, 2004, and the present.

17.     The definitions of the National Class and the Florida Class (collectively, the "Classes") specifically exclude the following persons or entities: the Defendant; any of the Defendant's parent companies, subsidiaries, or affiliates; any of Defendant's officers, directors, management , or employees; all governmental entities; and the judges and chambers staff in this case, as well as any members of their immediate families.

18.     While Plaintiff does not know the exact number of members of the Classes because such information is in the Defendant's exclusive control, Plaintiff believes that, due to the nature of the trade and commerce involved, there are hundreds-of-thousands of Class members, if not more, geographically dispersed throughout the United States, making joinder of all Class members impracticable.

19.     Members of the Classes can be readily ascertained from 1-800 Contacts' records.

20.     Plaintiff's claims are typical of the claims of fellow members of the Classes because Plaintiff directly purchased contact lenses from 1-800 Contacts, Plaintiff and all members of each Class were damaged by the same wrongful conduct, and the relief sought herein is common to all members of each Class.

21.     Numerous questions of law or fact common to the Classes – including but not limited to those identified below – arise from the anticompetitive and unlawful conduct alleged herein:

a.     Whether 1-800 Contacts entered into Bidding Agreements;

b.     Whether the Bidding Agreements resulted in search engine companies not displaying to Plaintiff and the Classes advertisements that were

        responsive to the user's search;

c.      Whether the Bidding Agreements deprived Plaintiff and the Classes of truthful and non-misleading information about the prices, products, and services offered by 1-800 Contacts' competitors in the market for online sales of contact lenses;

d.      Whether the Bidding Agreements limited price and competition among online sellers of contact lenses;

e.      Whether the Bidding Agreements caused Plaintiff and the Classes to pay higher prices for contact lenses than they would have paid absent the agreements, acts, and practices of 1-800 Contacts;

f.      Whether 1-800 Contacts violated Section 1 of the Sherman Act;

g.      Whether 1-800 Contacts violated the Florida Deceptive and Unfair Trade Practices Act and Florida Antitrust Act of 1980; and

k.      The appropriate nature of class-wide measure of damages, injunctive, and/or other equitable relief.

22.    These and other questions of law and fact that are common to the Classes predominate over any questions affecting members of the Classes individually.

23.    Plaintiff will fairly and adequately represent the interests of the Classes because each of them purchased contacts from 1-800 Contacts and they have no conflicts with any other members of the Class.  Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions and other complex litigation.

24.    Defendant has acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

25.     This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

26.     The prosecution of separate actions by individual members of any of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct.

## TRADE AND COMMERCE

27.     During the Class Period, 1-800 Contacts sold contact lenses in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial District.

28.     The conduct alleged herein substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States to Plaintiff and members of the Classes.

## FACTUAL ALLEGATIONS

A.     Competition for Online Retail Sales of Contact Lenses

29.     Contact lenses are medical devices that the United States Food and Drug Administration regulates. Contact lenses generally require a customer to obtain a prescription from an eye-care professional who is licensed under state law, including ophthalmologists, optometrists, and, at times, opticians. After obtaining a prescription, a user can have any authorized retailer fill it. In fact, the federal Fairness to Contact Lens Consumer Act, 15 U.S.C. § 7601, *et seq.,* prevents eye-care professionals from limiting consumers' ability to purchase contact lenses from discount retailers that sell at lower prices.

30.     Approximately 49.9 million people use contact lenses in the United States – approximately 12.8% of the population. Annual retail sales of contact lenses in the United States total slightly more than $4 billion. In 2012, approximately 1 6.7% of all retail contact lens sales occurred on-line, and that percentage has increased over the past several years.

31.     With respect to online sales of contact lenses, there are specialized sellers, distribution channels, logistics, and promotional strategies, and a distinct subset of consumers who look principally or only to online sellers in order to fill their prescriptions, all of which makes the market for online sales of contact lenses unique from other channels of contact lens sales.

32.     1-800 Contacts has long been the largest online seller of contact lenses in the United States. Indeed, the FTC recently estimated that 1-800 Contacts sales constitute 50% of the online retail sales of contact lenses in the United States. The FTC further estimates that the combined share of 1-800 Contacts and the firms with which it executed Bidding Agreements is approximately 80%.

33.     1-800 Contacts was formed in 1995 and was a pioneer in direct-to-consumer sales of contact lenses, including online sales of contact lenses.  However, by the early 2000s, a number of competing online retailers had emerged, and many of them were expanding rapidly. Online rivals invested in search advertising and competed directly against 1-800 Contacts, often undercutting 1-800 Contacts' prices for contact lenses, many by a substantial amount.

34.     As early as 2003, 1-800 Contacts recognized that it was losing sales to  lower-priced online competitors, but 1-800 Contacts did not want  to  lower its prices  to compete with those rivals. To this day, 1-800 Contacts' prices remain higher than the prices of its rivals, but the Bidding Agreements limit competition, and, therefore, permit 1-800 Contacts to continue to maintain unreasonably-high prices.

B.      Online Search Advertising

35.      Search engines, such as Google, Bing, and Yahoo, are available to internet users without charge. The search engines finance their services, in part, through the sale of search advertising, which refers to the paid advertisements that appear, in response to a search query, on the results page above or adjacent to the actual search results.

36.      Search advertising permits advertisers to deliver a targeted message to a user at the precise moment that the user has expressed an interest in a specific subject. Often, the user is contemplating making a purchase at that time as well. For example, a seller of contact lenses can display its advertisement to a user who has entered the search query, "on-line sales of contact lenses."

37.      Search engine users get value from search advertising because the advertisements permit fast, easy competition by permitting users quickly to navigate among several different websites that offer comparable products. For example, a user seeking to purchase contact lenses can benefit from paid advertisements because the advertisements present a range of merchants offering products from the same manufacturer. The user then can compare price, service, and other competitive factors that can influence a purchasing decision.

38.      Search engine companies sell advertising space on the search engine results page by means of auctions.  Advertisers bid for placements using keywords. A separate and automated search advertising auction is conducted each time a user enters a query.

39.      When purchasing search engine advertisements, an advertiser can specify particular keywords to which it wants its advertisement to appear in response. In general, the advertiser specifies whether its ad should appear as a result of (a) a broad match (whenever a search contains a phrase that is similar to the one that the advertiser has specified), (b) an exact match of

a search term or search phrase that the advertiser has specified, or (c) a search term that includes a phrase that the advertiser has specified.

40.     Alternatively, the advertiser can permit the search engine company to use its own algorithms to identify relevant auctions for the advertiser, regardless of the key words in question.

41.     When a consumer enters a query, an algorithm evaluates the relevant bids for the advertising auction. The winner or winners of the auction will have their advertisements displayed to the user. If the user clicks on an advertisement and visits the advertiser's website, then the advertiser pays a fee to the search engine company.

42.     Search engine companies determine whether and in what order to place advertisements using sophisticated algorithms that consider the quality of the advertisement. "Quality" refers to the search engine's assessment of whether the advertisement will be relevant and useful to the user. The search engine makes this assessment based on the search engine's analysis of user feedback, including click-through data, which is incorporated in real time into the algorithms that determine which advertisements will be shown. As part of that process, the search engine demotes or eliminates advertisements that prove not to be relevant or useful to users.

43.     Search engine users sometimes search for a trademarked word or phrase such as "1-800 Contacts." In response, the search engine can provide the user with advertisements for the trademark-owner's product or for other, related companies. Thus, when a user searches for "1-800 Contacts" on Google, the advertisements returned in response might be for 1-800 Contacts or for one or more other online retailers of contact lenses.

44.     An advertiser can also specify negative keywords for a search engine. Negative keywords instruct the search engine not to include the company's advertisement in response to a

particular search.   For example, a company that sells ice hockey equipment might use "air" as a negative keyword to prevent its advertisement from being displayed in response to a query about "air hockey."

       C.     <u>The Bidding Agreements</u>

45.     In or around 2004, 1-800 Contacts began sending cease-and-desist letters to rival online sellers of contact lenses whose search advertisements appeared in response to user queries containing the term "1-800 Contacts" (or similar variations). 1-800 Contacts accused its rivals of infringing its trademarks.

46.     1-800 Contacts claimed that the mere fact that a rival's advertisement appeared on the results page in response to a query containing "1-800 Contacts" constituted trademark infringement. 1-800 Contacts threatened to sue its competitors that did not agree to cease participating in these search advertising auctions. In addition to these threats, 1-800 Contacts actually sued the following online contact lens sellers:

        a.   Arlington Contact Lens Service d/b/a Discount Contact Lenses, who sold contact lenses through the websites www.aclens.com and www.discountcontactlenses.com;

        b.   Contact Lens King, who sold contact lenses through the website www.contactlensking.com;

        c.   Empire Vision Center, who sold contact lenses through the website www.lens123.com;

        d.   JSJ Enterprises, who sold contact lenses through the website www.contactlensconnection.com;

        e.   LensWorld, who sold contact lenses through the websites

       www.lensworld.com, www.contactmania.com and www.contactlensworld.com;

f.   Lensfast, who sold contact lenses through the websites www.lensfast.com, www.contactlens.com and www.e-contacts.com;

g.   Lenses for Less, who sold contact lenses through the website www.lensesforless.com;

h.   Memorial Eye P.A., who sold contact lenses through the websites www.shipmycontacts.com, www.ship-my-contacts.com, and www.iwantcontacts.com;

i.   Premier Holdings, who sold contact lenses through the websites www.ezcontactusa.com and www.filmart.com;

j.   Standard Optical, who sold contact lenses through the website www.standardoptical.net;

k.   Tram Data LLC, who sold contact lenses through the website www.replacemycontacts.com;

l.   Walgreen Company, who sold contact lenses through the website www.walgreens.com; and

m.   Web Eye Care, Inc., who sold contact lenses through the website www.webeyecare.com.

47.     Most often, rivals agreed to 1-800 Contacts' demands in order to avoid prolonged and costly litigation against a larger competitor. Only one competitor refused to settle and proceeded to litigation.

48.     1-800 Contacts' position lacked even the barest hint of merit. Indeed, when

one competitor – Lens.com – resisted 1-800 Contacts' threats, the U.S. Court of Appeals for the 10th Circuit rejected 1-800 Contacts' theory of trademark infringement. *See 1-800 Contacts, Inc.* v. *Lens.com, Inc.,* 722 F.3d 1229, 1245-49 (10th Cir. 2013).

49.     Between 2004 and 2013, 1-800 Contacts entered at least fourteen Bidding Agreements with rival on-line sellers of contact lenses settling 1-800 Contacts' purported trademark claims by restricting bidding in search advertising auctions.

50.     The Bidding Agreements go well beyond prohibiting trademark infringement. They restrain a broad range of truthful, non-misleading, and non-confusing advertising.

51.     All fourteen Bidding Agreements bar 1-800 Contacts' competitors from bidding in a search advertising auction for any of 1-800 Contacts' trademarked terms, such as "1- 800 Contacts" or variations thereof.

52.     Thirteen of the 14 No-Bidding Agreements also require 1-800 Contacts' competitors to employ negative keywords directing the search engines not to display the specific competitor's advertisement in response to a search query that includes any of 1-800 Contracts' trademarked terms (or variations thereof), even if the search engines' algorithms determine that the advertisement would be relevant and useful to the user. Thus, even if a user enters a query for "1-800 Contacts cheaper alternatives" or "1-800 Contacts competitors," the user will see advertisements only for 1-800 Contacts. These agreements are also reciprocal, requiring 1-800 Contacts to employ its competitors' trade names and variations thereof as negative keywords in its own advertising campaigns.

53.     1-800 Contacts has aggressively policed the Bidding Agreements, complaining to competitors when the company suspects a violation, threatening further litigation, and demanding compliance.

54.     1-800 Contacts has actively concealed the existence of and the effect of the Bidding Agreements by including confidentiality provisions in the Bidding Agreements and through other actions designed to create the impression that search results returned by search engines were honest and untainted.

D.     Anticompetitive Effects of the Bidding Agreements in Relevant Markets

55.     The relevant product market in which to analyze the impact of the Bidding Agreements is the market for the retail sale of contact lenses. In addition, the market for online retail sale of contact lenses is a distinct submarket in which to analyze the impact of the Bidding Agreements.

56.     Both 1-800 Contacts and its online sales competitors, co-conspirators sell contact lenses nationwide, without any distinction for the buyer's location. The relevant geographic market is therefore the United States.

57.     1-800 Contacts' conduct had the purpose, capacity, tendency, and effect of restraining competition unreasonably and injuring consumers, including Plaintiff and the Classes, in the following ways, among others:

a.   Preventing search engine companies from displaying to users on the results page the advertisements that are most responsive to a user's search;

b.   Impairing the quality of the service provided to consumers such as Plaintiff and the Classes by search engine companies, including the results page;

c.   Depriving consumers such as Plaintiff and the Classes of truthful and non-misleading information about the prices, products, and services offered by 1-800 Contacts' competitors in the market for online sales of contact lenses;

14

    d.   Limiting price and service competition among online sellers of contact lenses;

    e.   Preventing online sellers of contact lenses from disseminating truthful and non-confusing information about the availability of, and prices for, their products and services; and

    f.   Causing Plaintiff and the Classes to pay higher prices for contact lenses than they would pay absent the agreements, acts, and practices of 1-800 Contacts.

58.    As horizontal agreements that restrain price competition and restrain truthful and non-misleading advertising, the Bidding Agreements are *per se* illegal, or alternatively, under the "quick look" test or Rule of Reason. Furthermore, the Bidding Agreements are overbroad because they exceed the scope of any property right that 1-800 Contacts may have had, now or at any time, in its trademarks, and the Bidding Agreements are not reasonably necessary to achieve any procompetitive benefit. Less restrictive alternatives are available to 1-800 Contacts to safeguard any legitimate interest the company might have had under trademark law.

59.    Significant barriers to entry prevent new competitors that are not subject to Bidding Agreements from entering the market. A new entrant would have to build the infrastructure necessary, would have to have the resources to purchase the relevant inventory, and would have to attract substantial consumer attention. These barriers mean that the possibility of a new entrant does not place any meaningful limit on 1-800 Contacts' ability to raise its prices. At the same time, the Bidding Agreements mean that existing competitors do also do not place a meaningful limit on 1-800 Contacts ability to raise its prices.

60.    1-800 Contacts' conduct harmed Plaintiff, the Class and the Florida Subclass

by depriving each of a marketplace free from influence of 1-800 Contacts' Bidding Agreements with its competitors, co-conspirators. According to the FTC, the combined share of 1-800 Contacts and the fourteen online sellers that executed the Bidding Agreements is approximately 80 percent. In what should be a competitive market, 1-800 Contacts maintains approximately 50 percent of the online retail contact lens market.

61.     Plaintiffs have suffered significant injury as a result of 1-800 Contacts' contact lens price manipulation conspiracy. 1-800 Contacts' illegal trade restraints reached enough prospective customers to allow 1-800 Contacts to charge inflated, supracompetitive prices to its online customers. A usual online market would present a consumer with competing prices and offer from various contact lens vendors. Any vendor who offered the same contact lenses at prices higher than their competitors would either (a) risk losing business to its rivals, or (b) lower prices to bring them in line with their competitors' prices and compete for sales. However, through agreements that rigged search results in response to online user queries, Defendant ensured that consumers were presented primarily with the 1-800 Contacts option to purchasing lenses online. But for Defendant's anticompetitive conduct, consumers would have been aware of and presented with competing options from various sellers of contact lenses.

62.     1-800 Contacts' conduct cause significant anticompetitive effects including restraining or eliminating price competition sold directly to U.S. consumers and fixing, raising or maintaining the price of contact lenses sold online at artificially high levels.

63.     As a result, Plaintiff and the Classes have been injured in their business and property in that, during the Class Period, they paid more for contact lenses than they would have in the absence of the Defendant's conduct.

E.       The FTC's Enforcement Action Against 1-800 Contacts

64.       On or about August 11, 2016, the FTC filed an action against 1-800 Contacts alleging that the Bidding Agreements violate Section 5 of the Federal Trade Commission Act. The FTC's action is captioned *In the Matter of 1-800 Contacts, Inc.,* Docket No. 9372 (FTC).

F.       Fraudulent Concealment and Tolling

65.       1-800 Contacts affirmatively concealed from Plaintiff and other members of the Classes its unlawful conduct. 1-800 Contacts created and implemented its unlawful plan in private, and affirmatively avoided publicly disclosing the scheme, and took other actions to hide and conceal the unlawful conduct.

66.       1-800 Contacts negotiated and settled its baseless trademark infringement lawsuits in secret, and fraudulently concealed from the public and from Plaintiff and the members of the Classes the anticompetitive, fraudulent, and deceptive nature of each of the Bidding Agreements, which were disguised as private, trademark lawsuit "settlements," but were not submitted to the courts, let alone approved by the courts.

67.       Further, 1-800 Contacts made numerous misleading public statements about the purported competition in the market for the online retail sale of contact lenses. Indeed, shortly before the FTC filed its complaint, 1-800 Contacts' director of business development stated that " l-800 Contacts is educated to providing customers with more choice, greater, convenience, and lower prices " At the same time, 1-800 Contacts was secretly depriving those same consumers of the choice.

68.       On July 2014, 1-800 Contacts' General Counsel testified in a Hearing before the Senate Committee of the Judiciary, Subcommittee on Antitrust, Competition Policy, and Consumer Rights that the company "served over 15 million unique customers who value having

choice in where they purchase their contact lenses," while 1-800 Contacts was engaged in anti-competitive conduct to foreclose competition, reduce consumer choice, and charge higher prices for online contact lenses.

69.     Accordingly, Plaintiff and other members of the Classes did not discover, nor could they discover through reasonable diligence, 1-800 Contacts' anticompetitive conduct alleged herein. 1-800 Contacts' (and/or its co-conspirators') false and misleading statements or omissions lulled Plaintiff and other members of the Classes into believing that the online retail prices paid for contact lenses were the result of competitive market forces rather than collusive or anticompetitive practices.

70.     It was not until the filing of the FTC Complaint on August 8, 2016 that Plaintiff and other members of the Class reasonably could have known of the unlawful conduct alleged herein; and yet, even details in the FT Complaint are redacted. Accordingly, Defendant is equitably estopped from asserting that any applicable limitation period has run, or that the statute of limitations began running before August 8, 2016.

G.     1-800 Contacts Arbitration Provision is Neither Binding Nor Enforceable

71.     1-800 Contacts' website has a "Terms of Service" page which states: "Any dispute relating in any way to our visit to this website or to products you purchase through us shall be submitted to confident al arbitration in Salt Lake City, Utah, except that, to the extent you have in any manner violated or threatened to violate our intellectual property rights, we may seek injunctive or other appropriate relief in any state or federal court in the state of Utah, and you consent to exclusive jurisdiction and venue in such courts."

72.     This paragraph about arbitration, however, is not binding on Plaintiff, the National Class, or the Florida Subclass. Any agreement to arbitrate is not specifically

highlighted on 1-800 Contacts' website.   In fact, there are no direct links to the "Terms of Service" page on 1-800 Contacts' home page. Rather, the link to the arbitration provision is on an obscure page of 1-800 Contacts' website that is difficult to find even if the user specifically sets out to find it.  The only way to find the "Terms of Service" page is to click on the "Common Questions (FAQ)" link on the 1-800 Contacts' homepage, which itself is in extremely small print and is likely to be overlooked.

73.      After clicking on the "Common Questions" link, there is still no immediate mention of arbitration. Instead the last link on the "Common Questions" page, which has to be scrolled down to see in most browsers, is a link entitled "Terms of Service."

74.      After clicking the "Terms of Service" link, a consumer can finally access the "Terms of Service" page, which contains the mention of arbitration. Even in the unlikely event that a consumer did find and review the "Terms of Service" page before ordering contact lenses through 1-800 Contacts' website, the arbitration language is only viewable if a user scrolls down to a section titled "Disputes."

75.      Nor does 1-800 Contacts' website offer a search tool that allows a user to search the website for "terms," "conditions," "arbitration," "grievances," "dispute resolution," or anything of the sort. The only search box on the website is one that allows a user to look specifically for different brand and kinds of contact lenses.

76.      In addition, there is no place for a consumer to acknowledge receipt of the arbitration provision or for a consumer to acknowledge that it understood that it was governed by the arbitration provision. In fa t, there is no requirement that a 1-800 Contacts customer even see the arbitration provision be ore ordering contacts through 1-800 Contacts' website, let alone take action to expressly consent to the arbitration provision. As such, there was never

any meeting of the minds, as required by law, regarding the arbitration of disputes, and any reasonable user of 1-800 Contacts' website would be surprised by the existence of the arbitration provision.

77.     Moreover, 1-800 Contacts retained the full right to unilaterally modify the terms of the arbitration agreement, as shown by carving out intellectual property disputes.

78.     Accordingly, 1-800 Contacts' arbitration provision is unconscionable, contrary to public policy, and unenforceable.

**FIRST CAUSE OF ACTION**
**RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT § 1**
**(Asserted by Plaintiff on Behalf of the National Class)**

79.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

80.     Beginning at least in 2004, the exact date being unknown to Plaintiff and the Classes and exclusively within the knowledge of the Defendant, 1-800 Contracts and its co-conspirators entered into the Bidding Agreements, which constitute continuing agreements, combinations or understandings between and/or among 1-800 Contacts and its co-conspirators to restrain trade and commerce unreasonably in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) by limiting competition in the market for online sales of contact lenses directly to consumers..

81.     As a result of the Defendant's unlawful conduct and acts, retail prices for contact lenses were higher than they would have been in the absence of such conduct.

82.     There was and is no procompetitive benefit from, or legitimate business reason for, Defendant's unreasonable restraint of trade.

83.     Defendant's anticompetitive and unlawful conduct is unlawful *per se* under

the Sherman Act, or alternatively, under the "quick look" test or Rule of Reason

84.     Defendant's conspiracy – in concert with its competitors – and the resulting impact on the prices of contact lenses and the information provided to the consuming public occurred in and affected interstate commerce and commerce in and between the territories of the United States.

85.     As a direct and proximate result of the Defendant's anticompetitive and unlawful conduct, Plaintiff and members of the National Class have been injured in their business and property in that they have paid more for contact lenses than they otherwise would have paid in the absence of Defendant's conduct.

86.     As a co-conspirator, 1-800 Contacts is jointly and severally liable for damages suffered by the National Class resulting from the online sales by 1-800 Contacts' co-conspirators.

87.     Plaintiff and the National Class members injuries are precisely the type of antitrust injuries that the antitrust laws were designed to prevent and their injuries flow directly from Defendant's unlawful conduct.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE FLORIDA ANTITRUST ACT OF 1980
### (Asserted by Plaintiff on Behalf of the Florida Class)

88.     Plaintiff incorporates by reference ¶¶1-78 as though fully set forth herein.

89.     Defendant's actions, described above, violate the Florida Antitrust Act of 1980 ("Florida Antitrust Act"), Section 542.18, Fla. Stat. (2017), *et seq*., by engaging in a contract, combination or conspiracy in restraint of trade and commerce in Florida.

90.     Plaintiff and each member of the Florida Class purchased contact lenses for personal use from 1-800 Contacts, and suffered an ascertainable loss of money or property because each of them paid a price higher than what they should have for contact lenses purchased from 1-

800 Contacts.

91.     Defendant's Bidding Agreements deprived consumers of truthful, non-misleading information about competition in the market for online sales of contact lenses. In addition, the Bidding Agreements cause misleading representations to consumers who search for 1-800 Contacts that there are no alternatives to 1-800 Contacts in the market.

92.     1-800 Contacts engaged in false, misleading, or deceptive acts by entering into the Bidding Agreements. The Bidding Agreements deprive consumers of truthful, non-misleading information about competition in the market for online sales of contact lenses. In addition, the Bidding Agreements cause misleading representations to consumers who search for 1-800 Contacts that there are no alternatives to 1-800 Contacts in the market.

93.     1-800 Contacts' conduct is a direct and proximate cause of the harm that Plaintiff and members of the Florida Class have suffered because it has caused them to pay prices that are above the market price for on-line purchases of contact lenses.

94.     Plaintiff and members of the Florida Class are entitled to recover threefold the amount of their actual damages, as well as the cost of suit, including a reasonable attorney's fee. § 542.22(1), Fla. Stat. (2017).

95.     Plaintiff and members of the Florida Class are entitled to injunctive relief enjoining Defendants' conduct in violation of the Florida Antitrust Act of 1980. § 542.23, Fla. Stat. (2017).

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE FLORIDA**
**DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Asserted by Plaintiff on Behalf of the Florida Class)**

96.     Plaintiff incorporates by reference ¶¶1-78 as though fully set forth herein.

97.     Defendants' actions, described above, violate the Florida Deceptive and Unfair Trade Practices Act, as set forth in § 501.204, Fla. Stat. (2017), by engaging in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

98.     Plaintiff and each member of the Florida Class is a consumer within the meaning of § 501.203(7), Fla. Stat. (2017).

99.     Defendant engaged in trade or commerce within the meaning of § 501.203(8), Fla. Stat. (2017).

100.     Plaintiff and each member of the Florida Class purchased contact lenses for personal use from 1-800 Contacts.

101.     Plaintiff and each member of the Florida Class suffered an ascertainable loss of money or property because each of them paid a price higher than what they should have for contact lenses purchased from 1-800 Contacts.

102.     Defendant's Bidding Agreements deprived consumers of truthful, non-misleading information about competition in the market for online sales of contact lenses. In addition, the Bidding Agreements cause misleading representations to consumers who search for 1-800 Contacts that there are no alternatives to 1-800 Contacts in the market.

103.     The Defendant's conduct occurred in business or commerce.

104.     To the extent reliance is required, Plaintiff and each member of the Florida Class reasonably relied on the misleading search results caused by the Bidding Agreements.

105.     1-800 Contacts engaged in false, misleading, or deceptive acts by entering into the Bidding Agreements. The Bidding Agreements deprive consumers of truthful, non-misleading information about competition in the market for online sales of contact lenses. In

addition, the Bidding Agreements cause misleading representations to consumers who search for 1-800 Contacts that there are no alternatives to 1-800 Contacts in the market.

106.    1-800 Contacts' conduct is a direct and proximate cause of the harm that Plaintiff and members of the Florida Class have suffered because it has caused them to pay prices that are above the market price for on-line purchases of contact lenses.

107.    Plaintiff and the members of the Florida Class are entitled to recover their actual damages and attorneys' fees under §§ 501.211(2) and 501.2105(1), Fla. Stat. (2017).

108.    Pursuant to § 501.211(1), Fla. Stat. (2017), Plaintiff and the members of the Florida Class are entitled to a declaration that Defendant's conduct violates the FDUTPA, § 501.204, Fla. Stat. (2017), and are entitled to injunctive relief to enjoin Defendant's conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter judgment on her behalf and on behalf of the Classes defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B.    Defendant has combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and the Classes have been injured in their business and property as a result of Defendant's violations;

C.    Plaintiff and the Classes are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Classes be entered against Defendant in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.      Defendant has violated the Florida Antitrust Act, and that Plaintiff is entitled to recover threefold the damages sustained by her, as well as the cost of suit, including reasonable attorneys' fees, pursuant to § 542.22, Fla. Stat. (2017);

E.      Plaintiff and members of the Florida Class are entitled to injunctive relief enjoining Defendants' conduct in violation of the Florida Antitrust Act of 1980 pursuant to § 542.23, Fla. Stat. (2017);

F.      Defendant has violated the Florida Deceptive and Unfair Trade Practices Act, and that Plaintiff is entitled to damages and an award of attorney fees pursuant to §§ 501.211(2), 501.2105(1), Fla. Stat. (2017);

G.      Plaintiff and the members of the Florida Class are entitled to a declaration that Defendant violated the Florida Deceptive and Unfair Trade Practices Act, § 501.204, Fla. Stat. (2017), and are entitled to injunctive relief to enjoin Defendant's conduct pursuant to § 501.211(1), Fla. Stat. (2017);

H.      Plaintiff and the Classes are entitled to pre-judgment and post-judgment interest on the damages awarded them, as allowed by law, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendant;

I.      Plaintiff and the Classes are entitled to equitable and injunctive relief appropriate to remedy Defendant's past and ongoing restraint of trade, as allowed by law, including: a judicial determination declaring the rights of Plaintiffs and the Classes and the corresponding responsibilities of the Defendant; and issuance of a permanent injunction against Defendant and its parents, subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof

and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein

   J.  Defendant is to be responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

   H.  Plaintiff and the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

   J.  Plaintiff and the Classes receive such other or further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

   Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.


DATED: April 7, 2017     Respectfully submitted,

       By: */s/ James L. Kauffman*
         James L. Kauffman (FL Bar No. 12915)
         **BAILEY GLASSER LLP**
         1054 31st Street, NW, Suite 230
         Washington, DC 20007
         Phone: 202.463.2101
         Facsimile: 202.463.2103
         jkauffman@baileyglasser.com

         Steven L. Bloch (*Pro Hac Vice Pending*)
         Mark B. DeSanto (FL Bar No. 107688)
         **BAILEY GLASSER LLP**
         One Tower Bridge
         100 Front Street, Suite 1235
         West Conshohocken, PA 19428
         Phone: 610.834.7506
         Facsimile: 610.834.7509
         sbloch@baileyglasser.com
         mdesanto@baileyglasser.com

Randall K. Pulliam (*Pro Hac Vice Pending*)
rpulliam@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**
519 West 7th Street
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
Facsimile: (501) 312-8505